IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

YORKTOWNE UROLOGY, P.C.,             :
                                     :
                                     :
          Plaintiff                  :     CIVIL NO. 1:CV-10-644
                                     :
     vs.                             :
                                     :
NEUISYS, LLC.                        :
                                     :
          Defendant

*M E M O R A N D U M*

I.   *Introduction and Procedural History*

          Plaintiff is Yorktowne Urology, P.C., a Pennsylvania medical practice

providing urological services, and defendant is Neuisys, LCC, a North Carolina company.

We are considering Defendant's motion for summary judgment.

          Yorktowne acquired a CT scanner from Neuisys.  The scanner was to be

used to diagnose kidney, ureter and bladder disorders by making so-called KUBS scans

(for kidney, ureter, bladder).  Plaintiff filed suit in state court, alleging, among other things,

that the scanner failed to produce scans of the quality necessary for medical diagnoses.

The scanner could produce usable scans, but it had to use a level of radiation that was

unsafe for patients.  Plaintiff presented seven causes of action: (1) in Count I, a

fraudulent inducement claim, alleging that Defendant knowingly made false

representations to induce Plaintiff to purchase the scanner; (2) in Count II, a claim for

promissory and equitable estoppel; (3) in Count III, a claim for breach of contract,

asserting a material breach of the agreement and that Defendant refused to recognize Plaintiff's rejection of the scanner or, in the alternative, its revocation of the contract; (4) in Count IV, a claim for breach of express warranty, invoking the Pennsylvania Uniform Commercial Code; (5) in Count V, a claim for a breach of the implied warranty of merchantability under the Pennsylvania Uniform Commercial Code; (6) in Count VI, a claim for strict liability under the Restatement (Second) of Torts § 402A; and (7) in Count VII, a claim for a breach of the duty of good faith and fair dealing.

Invoking our diversity jurisdiction, *see* 28 U.S.C. § 1332(a), Defendant removed the action here and filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  In ruling on the motion, we dismissed Count II (promissory and equitable estoppel), Count IV (express warranty), and Count VI (strict liability).  *See* 2010 WL 3328067 (M.D. Pa. Aug. 23, 2010).  On Defendant's motion for reconsideration, we dismissed Count V, the claim for a breach of implied warranties of merchantability and fitness.  *See* 2010 WL 4054178 (M.D. Pa. Oct. 14, 2010).

The parties undertook discovery, and Defendant has now moved for summary judgment on the remaining claims, Count I, fraudulent inducement, Count III, breach of contract, and Count VII, breach of the contractual duty of good faith and fair dealing.  North Carolina law applies to all three claims.

II.   *Standard of Review*

Under Fed. R. Civ. P. 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In pertinent part, parties

moving for, or opposing, summary judgment must support their position by "citing to

particular parts of materials in the record, including depositions, documents, electronically

stored information, affidavits or declarations, stipulations (including those made for the

purposes of the motion only), admissions, interrogatory answers, or other materials."

Fed. R. Civ. P. 56(c)(1)(A).  In deciding a motion for summary judgment, "[t]he court need

consider only the cited materials, but it may consider other materials in the record."  Fed.

R. Civ. P. 56(c)(3).  "'The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor.'"  *Colwell v. Rite-Aid Corp.*, 602 F.3d 495, 501 (3d

Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505,

91 L.Ed.2d 202 (1986)).

III.   *Background*

        Based on the parties' evidentiary submissions, Defendant's statement of

material fact (SMF) and Plaintiff's response thereto, the summary-judgment record is as

follows.  We sometimes borrow the parties' language without attribution.[1]

        Plaintiff is a medical practice that specializes in urology.  In or around 2007,

plaintiff began investigating the possibility of acquiring a CAT Scan machine for in-office

use.  Plaintiff contacted Neuisys and other sellers of CT equipment to investigate their

_____

        [1]   Anita Wilkie was the CT technologist who operated the scanner for Plaintiff.  She
has submitted an affidavit in opposition to Defendant's motion for summary judgment.
Defendant has filed a motion to strike certain paragraphs of her affidavit.  We will include the
contested paragraphs in the background section of this memorandum and deal with the motion
to strike in the discussion section if necessary.

products.  In mid-December 2007, plaintiff signed a "Sales Agreement" with Neuisys to

acquire a NeuViz Dual CT Scanner for a total payment of $340,000.  (Doc. 1-5, Compl.,

Ex. B).  The Sales Agreement contained an integration clause, which read as follows:

"These terms and conditions, including any attachments or other documents incorporated

by reference herein, constitute the entire agreement and the complete and exclusive

statement with respect to the subject matter hereof, and supersede any and all prior

agreements, understandings, and communications between the parties with respect to

the Products."  (Doc. 1–5, Agreement ¶ 20, CM/ECF p. 5).

      Rather than pay for the scanner with cash or take out a loan to do so,

Yorktowne decided to enter into a finance lease with ACI Financial, Inc.  That agreement,

executed on December 27, 2007, recites that ACI Financial purchased the scanner from

Neuisys, and Yorktowne leased it from ACI.  However, ACI may not have entered into a

so-called supply contract with Neuisys, a contract by which the entity financing the

transaction acquires title to the product involved.  Here, Neuisys refers to its Sales

Agreement with Plaintiff as the supply contract.  In any event, the lease agreement

provided that Yorktowne's acceptance of the scanner "shall be irrevocable."  (Doc. 36,

Ex. B, CM/ECF p. 3).  It also provided that if a state has adopted the Uniform Commercial

Code, the lease would be considered a "finance lease."  (*Id.*).

      "During the discussions between Neuisys and plaintiff before the 'Sales

Agreement' was signed, Neuisys told plaintiff that the Scanner would meet plaintiff's

needs for in-office CT scanning, that Neuisys offered a "turnkey" solution, and that

Neuisys could manage construction, assist with locating a CT Technologist to operate the machine, assist with locating a radiology practice that could read the scans produced by the machine, and that it would provide service and support for the machine after it was installed." (Doc. 33, Def.'s SMF ¶ 5 and Pl.'s response).  Plaintiff elected not to have Neuisys do the construction on the area where the scanner would be located and did that on its own, but Neuisys advised on the physical site requirements.  (*Id.*, SMF ¶ 7 and Pl.'s response thereto).

The scanner needed a CT technologist to operate it.  (Doc. 33-1, Baselli Dep. at CM/ECF p. 71).  According to Defendant, Yorktowne "asked" it "to assist" Yorktowne in locating a CT technologist.  Plaintiff admits that it asked Neuisys to find a technologist.  (*Id.*, SMF ¶ 8 and Pl.'s response thereto).  However, it takes the position that Neuisys had contractually agreed to secure a technologist.  (Doc. 33-1, Baselli Dep. at CM/ECF pp. 70-71).  Plaintiff bases this position on Defendant's offer to "help find us a tech by placing ads," (*id.* at p. 71), or "assist us . . . through the process of hiring" a tech. (Doc. 33-8, Roggenbaum Dep. at CM/ECF pp. 31-32).[2]  Plaintiff needed this assistance as it had never hired a CT technologist before.  (*Id.*, CM/ECF p. 32).  Plaintiff also asserts that Defendant had contractually agreed to provide a temporary technologist if Plaintiff could not find one.  (Doc. 33-1 Baselli Dep. at CM/ECF p. 76; doc. 33-8, Roggenbaum Dep. at CM/ECF p. 33).  Dr. Baselli, Plaintiff's president, said that this temporary

---

[2]     Plaintiff also relies on the testimony of Asher Royal to support this position.  Royal testified "[i]t was part of a service that Neuisys provided," that Defendant "would help them identify technologists" that "would be fit for their practice."  (Doc. 37-2, Royal Dep. at CM/ECF p. 8).

technologist would be supplied by the time Yorktowne had received the scanner if a technologist had not yet been hired.  (Doc. 33-1 Baselli Dep. at CM/ECF pp. 70-71).

Neuisys did try to find a technologist.  They placed ads, and they were in communication with Yorktowne about getting one.  (Doc. 33-1, Baselli Dep. at CM/ECF p. 71).  Londa Marks, a Neuisys employee, "searched for resumes, screened potential candidates, and referred potential candidates to plaintiff for consideration."  (Doc. 33, Def.'s SMF ¶ 9 and Pl.'s response thereto).  The main problem appeared to be that the salary Defendant was advertising was too low for central Pennsylvania.  (Doc. 33-1 Baselli Dep. at CM/ECF p. 76; doc. 37-6, August 6, 2008, e-mails between Londa Marks and Kim Russell).  According to Marks's e-mails, there was also difficulty with the commute.  (Doc. 37-6, August 6, 2008, e-mails between Londa Marks and Kim Russell).

Neuisys delivered the scanner on July 28, 2008.  (Doc. 33, Def.'s SMF ¶ 10 and Pl.'s response thereto).  "In August 2008, Neuisys service engineers traveled to York and installed and calibrated the scanner so that it could be used for patients.  (*Id.* ¶ 12 and Pl.'s response thereto).  On September 9, 2008, Dr. Baselli signed a "Product Turnover Certificate," acknowledging that the scanner had "been installed and calibrated and [was] ready for patient use."  (*Id.* ¶ 13 and Pl.'s response thereto; doc. 33-6, the certificate).

As of September 9, 2008, Yorktowne had not yet hired a CT technologist, (*id.* ¶ 15 and Pl.'s response thereto), and Neuisys knew this.  (Doc. 37-5, Whelan Dep. at CM/ECF p. 47).   Consequently, through the fall of 2008, the scanner was not used.

Eventually, in January 2009, Yorktowne hired Anita D. Wilkie to be the CT technologist. (Doc. 37-7, Wilkie Aff. ¶ 15).  Wilkie had responded in December 2008 to an ad on monster.com.  (*Id.* ¶ 7).  Londa Marks did conduct some initial interviewing of Wilkie at the request of Sue Roggenbaum, Plaintiff's office manager, but cannot recall if she referred Wilkie to Roggenbaum or if Roggenbaum had made the initial contact with Wilkie.  (Doc. 37-3, Marks Dep. at CM/ECF pp. 29-30).

After she was hired, Wilkie contacted the Pennsylvania Department of Environmental Protection (DEP) to inspect the machine and facility to approve it for patient use.  (Doc. 33, Def.'s SMF ¶ 18 and Pl.'s response thereto; doc. 37-7, Wilkie Aff. ¶ 19).  "DEP inspector Howard Sher came to the facility, tested the machine, and determined that it operated within the guidelines established by the Commonwealth, and that it was safe to operate."  (Doc. 33, Def.'s SMF ¶ 19 and Pl.'s response thereto).

Plaintiff needed a radiologist to read the scans produced by the scanner. Neuisys recommended radiology practices, but Plaintiff rejected those suggestions and elected instead to contract with the Cleveland Clinic to read scans.  (*Id.* ¶ 20 and Pl.'s response thereto).

"When the Scanner was delivered, the KUB software, known as 'UroCare,' was pending FDA Approval."  (*Id.* ¶ 21 and Pl.'s response thereto).  Neuisys knew that the software was not FDA approved, (doc. 37-2, Royal Dep. at CM/ECF p. 13), but told Yorktowne that the scanner would perform KUBS upon delivery and installation.  (Doc. 33-1, Baselli Dep. at CM/ECF p. 35; doc. 33-8 Roggenbaum Dep. at CM/ECF p. 27).  "A

KUB is a plain abdominal X-ray.  The KUB software was an add-on capability for the Scanner to manipulate a CT Scan to reproduce a plain abdominal X-ray from the CT Scan."  (Doc. 33, Def.'s SMF ¶ 22 and Pl.'s response thereto).  Billing for KUBS scans would add to the revenue stream from the scanner.  (Doc. 33-1, Baselli Dep. at CM/ECF p. 35).  "The KUB Software received FDA Approval in March 2009 – approximately one month after plaintiff began scanning patients."  (Doc. 33, Def.'s SMF ¶ 26 and Pl.'s response thereto).  Dr. Baselli would have ordered the scanner even if he had known that FDA approval was pending.  (Doc. 33-1 Baselli Dep. CM/ECF pp. 127, 129).  However, his "partners," the other physician members in Yorktowne Urology also "had a decision on whether the scanner . . . was purchased . . . ."  (*Id.*, CM/ECF p. 148).

Neuisys charged Yorktowne $10,000 for the KUBS software.  (Doc. 33, Def.'s SMF ¶ 27 and Pl.'s response thereto).  The initial price, given verbally, was for $55,000.  (Doc. 33-8, Roggenbaum Dep. at CM/ECF p. 68).  However, the actual invoice sent was for $10,000.  (*Id.*).  An e-mail from Londa Marks, dated June 22, 2009, stated that it was a one-time licensing fee and much lower than the list price as Yorktowne was an existing customer.  (Doc. 33-9, Marks e-mail).  If Dr. Baselli had known about the one-time $10,000 fee, he would still have bought the scanner, but altered how he negotiated for it.  (Doc. 33-1, Baselli Dep. at CM/ECF p. 129).

Yorktowne hired three physicists to examine the scanner.  The first examination was on February 4, 2009, by Douglas E. Heim, and the second about three

weeks later on February 26, 2009, by Jane R. Fisher.[3]  Both Heim and Fisher

"determined that the machine was operating within the DEP regulations, that it did not

emit dangerous or illegal levels of radiation, and that it could perform proper scans."

(Doc. 33, Def.'s SMF ¶ 28 and Pl.'s response thereto).

      "Yorktowne began scanning patients with the Scanner on or around

February 9, 2009."  (*Id.* ¶ 29 and Pl.'s response thereto).  "Yorktowne could only bill for

scans that produced diagnostic quality images."  (*Id.* ¶ 30 and Pl.'s response thereto).

Over the next 10½ months, Yorktowne performed 2173 scans (services) on 925 patients.

(*Id.* ¶ 29 and Pl.'s response thereto; doc. 33-13, Ex. M (filed under seal)).  This was a

scan rate of four to five scans per day, five days per week, for the entire ten and a half

months the scanner was in service.  (Doc. 33-1, Baselli Dep. at CM/ECF pp. 130-31).

Yorktowne submitted invoices totaling $541,946.25 for these scans, and for which

patients, insurers and Medicare paid Yorktowne $387,602.74."  (Def.'s SMF ¶ 29 and

Pl.'s response thereto; doc. 33-13, Ex. M (filed under seal)).  These amounts did not

represent profits to Yorktowne.  It's "before anyone's paid."  (Doc. 33-1, Baselli Dep. at

CM/ECF pp. 134-35).

      "In February 2009, before plaintiff began scanning patients with the

Scanner, Neuisys sent Londa Marks, its CT Applications Specialist, to York to train [Anita

Wilkie] the new CT Technologist on operation of the machine, and to ensure that the

---

    [3]   The third one was done later, by Anthony D. Montagnese on December 1, 2009.
We will state the substance of his report later in this memorandum.

Scanner was operating properly and according to the manufacturer's specifications."

(Doc. 33, Def.'s SMF ¶ 25 and Pl.'s response thereto; doc. 37-7, Wilkie Aff. ¶ 21).  Wilkie

set the scanner at the protocols Londa Marks gave her, 120 kVp and 250 MAs.  (Doc. 37-

7, Wilkie Aff. ¶ 30).

On her first day of training, Wilkie, the only CT technologist to operate the

scanner, noticed that the scanner experienced tube arcing when both phantom image

scans and initial patient scans were conducted.  (Doc. 37-7 Wilkie Aff. ¶¶ 22, 24).  When

tube arcing occurred in the middle of a scan, the scanner stopped functioning during the

middle of a scanning sequence.  (*Id.* ¶ 23).  When that occurred, Wilkie "had to reset the

scanner and restart the scanning sequence."  (*Id.* ¶¶ 25, 40).  If a scanning sequence

had to be restarted, "the patient received more radiation than they would receive if the

initial scan was completed without interruption."  (*Id.* ¶ 41).  She "continued to operate the

Scanner because" Marks and Craig Whelan, a service engineer for Defendant, told her

"the tube arcing would stop once the Scanner was put into regular use and enough tube

conditions were performed on the Scanner to de-gas the Scanner tubes."  (*Id.* ¶ 26).

On February 20, Dr. William Davros of the Cleveland Clinic indicated to

[Wilkie] that the Cleveland Clinic had concerns with image quality and radiation output

from the Scanner."  (*Id.* ¶ 32).  In response to these concerns, Wilkie obtained the

services of Fisher in February 2009, who issued the report mentioned above, and who

also recommended new protocols "of 140 kVp and 150-185 MAs at a 1 second rotation

with a breath hold of 58 seconds to obtain clearer scans."  (*Id.* ¶ 35).   Wilkie used these

protocols because the Cleveland Clinic "indicated to [Wilkie] that the new images produced at the new protocols were better than the images produced at the manufacturer protocols." (*Id.* ¶ 36).

"The Scanner continued to experience tube arcing at the end of February 2009." (*Id.* ¶ 38).  Wilkie contacted Neuisys, (*id.* ¶ 39), and Defendant requested that the scanner be left "on overnight so that engineers could conduct tube conditioning" on it. (*Id.* ¶ 42).  "Despite site visits and remote tube conditioning[4] conducted by Neuisys service engineers, during the entire period of time [Wilkie] operated the Scanner at Yorktowne, the Scanner experienced tube arcing at least two to five times per week depending on Yorktowne's patient load." (*Id.* ¶ 44).  "The Scanner experienced tube arcing more frequently than any other scanner [Wilkie] operated." (*Id.* ¶ 45).[5]  According to Dr. Baselli, someone at Neuisys suggested to someone at Yorktowne that "there was something not right with the tube," that they "had some issues," but that Neuisys would "make it right." (Doc. 33-1, Baselli Dep. at CM/ECF p. 112).

"While he was still employed by Neuisys, Craig Whelan told [her] that the generator for the NeuViz dual scanner did not have enough power to operate the scanner" and that Neuisys knew that the generator "was not powerful enough . . . ." (Doc. 37-7, Wilkie Aff. ¶¶ 47, 48).

---

[4]   Tube conditioning did not have to be initiated on site.  (*Id.* ¶ 43).

[5]   Before working for Yorktowne, Wilkie was employed for about four years as a CT technologist, X-ray technologist and mammographer.  (*Id.* ¶ 9).

"On August 24, 2009, former Neuisys service engineer Robert Ritterbeck made a service call at Yorktowne for scheduled maintenance," (*id.* ¶ 49), and performed tube conditioning.  (*Id.* ¶ 52).  The scanner still continued to experience tube arcing.  (*Id.* ¶ 53).  "After working on the Scanner in 2009, Robert Ritterbeck told [Wilkie] that the image quality of the images produced by the Scanner was grainy."  (*Id.* ¶ 50).

To obtain ACR accreditation, Wilkie hired physicist Anthony D. Montagnese to inspect the scanner.[6]  In his report of December 3, 2009, Montagnese said the following.  First, as to state regulatory compliance, there were "no instances of non-compliance with State Bureau of Radiation Protection rules regarding C.T."  (Doc. 33-12, CM/ECF p. 2).  Second, as to system performance:

> The unit [is] operating adequately.  All indications are that it is in good calibration, and meets or exceeds the manufacturer's recommendations, with the exception of low contrast resolution.  In this regard, this system struggled to meet even the minimum image quality requirements, and could result in a denial of accreditation by an ACR reviewer.  Attempts to overcome this deficiency through protocol change brought image quality to a higher level (deceasing noise), but also resulted in an increase in patient radiation dose to a level that is just below the ACR's recommended maximum.  The use of such a protocol is further hampered by limitations due to patient breath-hold requirements. . . .

(*Id.*).  Third, as to patient dose:

> Measurements of patient dose show that this scanner meets the dosimetry requirements of the ACR Accreditation program; however, as mentioned above, it leaves a level of

---

[6]    According to Wilkie, all equipment producing radiation had to pass American College of Radiology (ACR) accreditation by January 1, 2012.  (*Id.* ¶ 54).

> image noise that makes low contrast resolution unacceptable.
> Reaching this minimum level of low contrast resolution can be
> attained, but at a patient dose of approximately 27.3 mGY
> CTDIvo1; whereas, the ACR's recommendation limit for an
> adult abdomen is 30 mGy.  This dose does not pose any kind
> of immediate threat of radiation injury to a patient, but does
> represent a dose that is higher than I normally see. . . .

(*Id.*).

Montagnese concluded that the "scanner was performing adequately but

that "image quality [was] marginal at the current protocol settings," and that the "low

contrast resolution" [was] insufficient" to pass ACR accreditation unless the radiation

dose was "increased to a level that is just under the ACR's limit for patient dose.  This

[was] further complicated by limitations on maximum patient breath-hold allowed by the

scanner software."  If the end goal was ACR accreditation, the only solution was higher

than usual doses.  (*Id.*, CM/ECF p. 13).

Wilkie adjusted the radiation dose in accord with Montagnese's report

because he indicated the scanner would not pass ACR accreditation without it.  (Doc. 37-

3, Wilkie Aff. ¶¶ 60-61).  Based on his report and recommendation, she "adjusted the

scanner abdomen protocol to 140 kVp, 250-300 MAs at a two second rotation and 1.85

pitch factor with breath hold of 100 seconds, to ensure compliance with ACR

accreditation standards."  (*Id.* ¶ 59).  She "could not perform the recommended protocol

on the Scanner because the maximum breath hold capacity for the Scanner was 60

seconds."  (*Id.* ¶ 61).

Wilkie told the Cleveland Clinic she could not conduct scans with the protocols Montagnese recommended.  (*Id.* ¶ 62).  On December 5, 2009, she stopped operating the scanner because the Cleveland Clinic indicated to [her] that they were concerned about the radiation levels emitted by the Scanner at the new recommended protocol and [she] wanted to make sure the radiation dose given to patients was not harmful."  (*Id.* ¶ 63).

She and Sue Roggenbaum then contacted Neuisys to give them the results of Montagnese's report and to request that a service engineer inspect the scanner.  (*Id.* ¶ 67).  Neuisys sent Mike Fitzpatrick, who inspected the scanner on December 14, 2009.  (*Id.* ¶ 68).  Fitzpatrick told Wilkie "that the X-ray tube on the Scanner was misaligned and the Collumniator calibration failed."  (*Id.* ¶ 69).  At Fitzpatrick's request, the scanner was left on overnight so that Neusoft engineers in China could work on it.  (*Id.* ¶ 70).).[7]  The next day, Fitzpatrick told Wilkie the scanner "was fixed," with the only explanation that the Neusoft engineers had placed "experimental values" in it.  (*Id.* ¶ 71).

On December 21, 2009, Wilkie began operating the scanner again.  (*Id.* ¶ 72).  The scanner experienced tube arcing "four to five times on each patient being scanned" that day.  (*Id.* ¶ 73).  Wilkie stopped operating the scanner after December 21, 2009, based on "ethical[ ] obligat[ions] . . . due to the excessive radiation that the Scanner emitted to patients in order to produce an acceptable diagnostic image."  (*Id.* ¶ 74).  She told the Yorktowne doctors she "did not feel comfortable operating the Scanner

_____

[7]   Apparently, a Chinese company called Neusoft manufactured the scanner.

-14-

based upon the level of radiation that the Scanner was exposing patients to while [she] operated" it.  (*Id.* ¶ 75).

Neither Dr. Baselli, Dr. Strang, a physician member in Yorktowne, nor Sue Roggenbaum could say from personal knowledge or expertise that the scanner was emitting unsafe levels of radiation (Doc. 33-1 Baselli Dep. at CM/ECF pp. 95-98; doc. 33-14, Strang Dep. at CM/ECF p. 5; doc. 33-8, Roggenbaum Dep. at CM/ECF p. 50).  Dr. Strang and Roggenbaum based their opinions on discussions with Wilkie.  (Doc. 33-14, Strang Dep. at CM/ECF p. 5; doc. 33-8, Roggenbaum Dep. at CM/ECF p. 50).  Dr. Strang expressed the theory that when the tube arced during a scan, the scan stopped and had to be started over again, thereby giving the patient additional radiation.  (Doc. 33-14, Strang Dep. at CM/ECF pp. 7-8).  Howard Sher said that the increased level of radiation recommended by Montagnese, 27.3 mGY, was "in a good area" for state guidelines.  (Doc. 37-10, Sher Dep. at CM/ECF p. 43).

According to Defendant's representatives, tube arcs happen on all scanners, regardless of make.  (Doc. 37-3, Marks Dep. at CM/ECF pp. 46-47 (tube arcs happened while she was training Wilkie and happen "occasionally everywhere"); doc. 38-1, Russell Dep. at CM/ECF p. 4 (arcing "was not extremely significant" and "happens to all CT scanners" albeit noting that Neusoft was attempting to improve in that regard); doc 37-4, Jenkins Dep. at CM/ECF p. 94).

According to Whelan, the former Neuisys field service engineer, a tube arc is a high-voltage failure.  (Doc. 37-5, Whelan Dep. at CM/ECF p. 53).  It can be caused

by many things, among them, a gassy tube or the scanner's generator.  (*Id.*).  A gassy

tube is usually caused when a CT scanner sits unused for a while, as Yorktowne's did.

(*Id.*, CM/ECF pp. 56, 148-49).  Tube conditioning, or as it is also called, tube seasoning,

heats the tube up to remove the gasses from the tube.  (*Id.*, CM/ECF pp. 37-38).  Whelan

was afraid that the Yorktowne scanner's tube arcing happened because the scanner had

been idle so long and the tube had become gassy.  (*Id.*, CM/ECF p. 56).

          According to Whelan, "there was some ongoing high-voltage issues at that

time with that particular CT."  (*Id.* CM/ECF p. 59).  Other sites were having high-voltage

errors too.  (*Id.*).  Some sites had the problem, while others did not.  (*Id.*, CM/ECF p. 60).

It was a problem Neuisys was trying to diagnose with the help of Neusoft factory

engineers.  (*Id.*, CM/ECF p. 59).  Whelan "changed out many generators" on this model

scanner in an attempt "to correct the high-voltage system."  (*Id.*, CM/ECF p. 118).

According to Dr. Jenkins, a Neuisys employee, Neuisys has replaced at least one

generator, maybe three, out of twenty-six generators in this model scanner, but does not

know why they were replaced.  (Doc. 37-4, CM/ECF pp. 90-91).  Asher Royal, a Neuisys

salesman, was aware of service calls about generators before Yorktowne bought its

scanner but does not know what the problems were with the generators, or whether they

were repaired or replaced.  (Doc. 37-2, Royal Dep., CM/ECF p. 17).

          The radiologists at the Cleveland Clinic read the scans for Yorktowne.  One

of them, Dr. Anne Singer, read about fifty per cent of the Yorktowne scans.  (Doc. 37-9,

Singer Dep. at CM/ECF p. 21).  She testified that the Cleveland Clinic received images

that they "had difficulty in interpreting." (*Id.* at CM/ECF p. 8).  The Clinic did not ask that

the patients be rescanned; instead they asked that Wilkie "try some different

reconstruction algorithms . . . ways of taking the data that's generated by the CAT scan

and reconstructing it to create an image." (*Id.* at CM/ECF p. 9).  The Clinic "never

refused to continue reading" the scans. (*Id.* at CM/ECF p. 10).  They "had concerns

about image quality and asked for an evaluation of the unit." (*Id.* at CM/ECF p. 10).

Singer contacted the Clinic's own physicists because of "ongoing concerns about image

quality . . . difficulty in interpreting the images," (*id.* at CM/ECF p. 11), concerns about the

Clinic's "ability to provide a quality interpretation based on the images that we were

receiving from that scanner." (*Id.* at CM/ECF p. 12).  Dr. Singer's concerns about image

quality were about "high noise" and "low contrast," which made it "difficult to see

pathology," but Dr. Singer never refused to read a scan. (*Id.* at CM/ECF p. 22).

Dr. Baselli could see the "lack of quality" in the scans, images that "were

fuzzy, blurry and full of artifact." (Doc. 33-1, Baselli Dep. at CM/ECF pp. 102, 103).  If he

had known the scans would look like this, he would not have chosen the Neuisys

scanner. (*Id.*, CM/ECF pp. 102-03).

According to Dr. Baselli, the scanner was down for much of the spring of

2009, "for a few months," (Doc. 33-1, Baselli Dep. at CM/ECF p. 90), but Yorktowne has

no records showing when the scanner was not being used, (*id.*, CM/ECF p. 93; doc. 33-8

(Roggenbaum Dep. at CM/ECF p. 78), and the Cleveland Clinic was submitting bills

throughout the spring for its reads of scans.  (Doc. 33-1, Baselli Dep. at CM/ECF pp. 89-90).

By letter, dated January 11, 2010, sent to Neuisys, Yorktowne rejected the scanner or, alternatively, revoked any acceptance.  (Doc. 37-8).  Yorktowne did not notify ACI Financial, the finance lessor.  (Doc. 33, SMF 38 and Pl.'s response thereto).

IV.   *Discussion*

A.  *The Fraudulent Inducement Claim*

Plaintiff has divided its fraudulent inducement claim into three parts: (1) Neuisys falsely represented that CT technologists were available, that it would supply Yorktowne with a CT technologist at the time the scanner was delivered and installed, and if it could not find a technologist by the time of delivery, it would supply a technologist temporarily until Yorktowne hired one; (2) Neuisys intentionally failed to disclose that the scanner exposed patients to unsafe levels of radiation during use and misrepresented that the scanner was fully operational, properly calibrated and ready for use upon delivery and installation; and (3) Neuisys intentionally failed to disclose that the KUBS software was not FDA approved and that Yorktowne would be required to pay a licensing fee when the software was approved.

The elements of a fraudulent inducement claim under North Carolina law are as follows: "(1) the defendant's false representation of a past or existing fact, (2) defendant's knowledge that the representation was false when made or it was made recklessly without any knowledge of its truth and as a positive assertion, (3) defendant

made the false representation with the intent it be relied on by the plaintiff, and (4) the

plaintiff was injured by reasonably relying on the false representation." *Britt v. Britt*, 359

S.E.2d 467, 471 (N.C. 1987).  Additionally, the misrepresentation may also have been an

omission of a material fact, and the defendant must also have acted with intent to

deceive.  *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 374 S.E.2d 385, 391-92

(N.C. 1988)(clarifying *Britt*).  Normally, a promissory misrepresentation will not support a

fraud claim unless the plaintiff also proves that when the defendant made the promise,

(1) it intended to deceive the plaintiff and (2) had no intention of fulfilling the promise.

*Hardin v. KCS Int'l, Inc.*, 682 S.E.2d 726, 736 (N.C. App. 2009).  Mere proof that the

defendant did not perform under the contract is not enough to show that when the

defendant made the contract, it had no intention to perform.  *Id.*

In moving to dismiss the first fraudulent inducement claim, Defendant

characterizes it as a claim that Defendant misrepresented that it would refer CT

technologists to Plaintiff.  On this understanding of the claim, Defendant argues that the

claim fails for the simple reason that the record shows that Defendant did do what it

promised to do, search for CT technologists and refer candidates to Yorktowne.  Hence

Defendant could not have made a promissory misrepresentation as it fulfilled its promise.

In opposition, Plaintiff points out that its claim is broader than the one

Defendant addresses, that Neuisys not only promised to look for a CT technologist, but to

actually supply one if an appropriate candidate had not been found by the time the

scanner had been delivered.  Thus, Defendant failed to perform the latter promise, regardless of any effort made to find and refer suitable candidates.

Yorktowne also asserts that the following evidence supports this claim. Yorktowne was relying on Neuisys to find a CT technologist, and Neuisys knew this because Plaintiff had told Neuisys "that it had no way of knowing who to hire."  (Doc. 36, Pl.'s Opp'n Br. at CM/ECF p. 14).[8]  Neuisys made the promise to find a technologist even though it had never made a scanner sale, nor filled a CT technologist position, in central Pennsylvania.[9]  Further, potential applicants indicated the compensation Neuisys offered was too low for the area, being based on a nationwide average not specific to central Pennsylvania.

We fail to see how the latter evidence supports a claim of fraud, nor does Plaintiff state why it does.  It may be that it is supposed to show that since Defendant went about the search so badly, it had no intention of doing so at all.  That is not a reasonable inference from the evidence.  The only thing this evidence tends to show is that Defendant failed to properly perform its promise.  As Defendant argues, evidence that a party to a contract actually tried to perform its obligation under its contract is not evidence of a fraudulent intent not to perform.  Additionally, failure to perform under a contract is not in itself evidence of fraudulent intent.  *Hardin, supra,* 682 S.E.2d 726 at

---

[8]    This assertion is not accurate.  It is based on the testimony of Sue Roggenbaum, who did not say she "had no way of knowing how to hire," but something far less limiting, that Plaintiff needed the assistance in hiring because it had never hired a CT technologist before.

[9]  We find no support in the record for this assertion but accept it for the purpose of argument.

736.  This conclusion also applies to Plaintiff's claim that Defendant promised to supply a CT technologist if an appropriate candidate had not been found by the time the scanner had been delivered.  At best, Plaintiff has only shown nonperformance of that promise. We will therefore enter summary judgment in Defendant's favor on this fraud claim.

The second fraudulent inducement claim has two parts: (1) Neuisys intentionally failed to disclose that the scanner exposed patients to unsafe levels of radiation during use; and (2) it misrepresented that the scanner was fully operational, properly calibrated and ready for use upon delivery and installation.

We begin with the claim based on unsafe levels of radiation.  In moving for summary judgment on this claim, Defendant relies on the four inspections of the scanner. The first examination was on February 4, 2009, by Douglas E. Heim, and the second about three weeks later on February 26, 2009, by Jane R. Fisher, both physicists Yorktowne hired to inspect the scanner.  Both Heim and Fisher determined that the machine was operating within the DEP regulations, that it did not emit dangerous or illegal levels of radiation, and that it could perform proper scans.  In February 2009, DEP inspector Howard Sher, a radiation health physicist, examined the scanner.  Sher determined that it operated within the guidelines established by the Commonwealth, and that it was safe to operate.  Finally, Anthony D. Montagnese, another physicist, hired by Plaintiff to assist in obtaining ACR accreditation, examined the scanner on December 1, 2009.  Montagnese stated there were "no instances of non-compliance with State Bureau of Radiation Protection rules regarding C.T."  In connection with the attempt to meet ACR

accreditation standards, he did say the radiation dose had to be increased.  However, even this increased dose was at a level that was below, albeit "just below," the ACR's recommended maximum.  Nonetheless, it represented no "immediate threat of radiation injury to a patient," although a higher dose than Montagnese "normally" saw.

In opposition, Plaintiff maintains that the physicists' reports are irrelevant to the fraudulent inducement claim because "[t]he fraudulent inducement claim relates back to Neuisys's knowledge that the Scanner would have problems and that Neuisys chose not to disclose those problems to Yorktowne from the outset."  (Doc. 36, Pl.'s Br. at CM/ECF pp. 15-16).  We fail to see how the physicists' reports are irrelevant to a claim that Defendant intentionally failed to disclose that the scanner emitted unsafe levels of radiation.  We believe this evidence alone refutes the fraud claim to the extent it is based on radiation levels.  Additionally, as noted in Defendant's reply brief, neither Dr. Baselli, Dr. Strang, nor Sue Roggenbaum could say from personal knowledge or expertise that the scanner was emitting unsafe levels of radiation.  Further, Sher, from the DEP,  said that the increased level of radiation recommended by Montagnese was "in a good area" for state guidelines.

We will therefore enter summary judgment on this part of the fraudulent inducement claim and will turn to Plaintiff's argument on the other part of the claim, that Neuisys falsely represented that the scanner was fully operational, properly calibrated and ready for use upon delivery and installation.

In moving for summary judgment on this part of the claim, Defendant relies on Dr. Baselli's admission that he has no reason to believe that when the scanner was installed it was not fully operational or calibrated.  (Doc. 33-1, Baselli Dep. at CM/ECF p. 121).  Defendant also relies on the "Product Turnover Certificate," signed by Dr. Baselli on September 9, 2008, acknowledging installation of the scanner and that it was "installed and calibrated according to factory specifications and [was] ready for patient use."

We agree with Defendant that no fraud claim can be based on whether the scanner was fully operational or calibrated to factory specifications when installed.  Plaintiff admits that in its response to Defendant's SMF ¶ 12.  In addition to Defendant's evidence, Dr. Montagnese said that the scanner was in "good calibration."

The real dispute is over whether the scanner was ready for use.  Plaintiff argues Neuisys committed fraud in this regard because before Neuisys sold the scanner to Plaintiff (or Plaintiff leased it from ACI Financial), Neuisys knew the following: (1) Defendant had to replace generators on other NeuViz dual slice scanners due to tube arcing, as told to Wilkie by a former Neuisys employee; (2) the generator Neuisys put in the scanner was underpowered for that model; (3) there were high-voltage issues at other sites and this was a problem it was trying to diagnose; (4) it had to replace a lot of generators on this model scanner and there were service calls related to the generator used in this model.  Plaintiff contends that this evidence establishes that Defendant made two material omissions of fact: (1) that the generators in the NeuViz dual slice scanner

had to be replaced; and (2) that tube arcing in this model scanner was a problem.  (Doc. 36, CM/ECF p. 15).

In reply, Defendant first argues that it is not fraud for a seller not to disclose "every nit, error, or repair that has been performed on every machine of like kind."  (Doc. 38, Def.'s Reply Br. at CM/ECF p. 12).  Second, Defendant argues the claim fails because Plaintiff has no evidence that there were known defects on the particular scanner Defendant provided Yorktowne.  Third, Neuisys points to evidence showing that tube arcing is common on all makes and models of scanners, that the tube arcing on Plaintiff's scanner happened because it had sat idle for so long in the fall of 2008 that the tube had gotten gassy, and that generators had only been replaced in about three of the twenty-six scanners it had sold in the United States.  Finally, Defendant argues that the lack of evidence from anyone, or from an expert, that the generator in Yorktown's scanner was defective, underpowered, or required replacement precludes an inference of fraudulent misrepresentation based on a generator failure or tube arcing on a different scanner.

We reject Defendant's first argument as Plaintiff is not contending that a material omission occurred because Neuisys failed to disclose "every nit, error, or repair" on every other NeuViz dual slice scanner; rather, it bases its claim on a serious characteristic of scanners in general, tube arcing, and a major component of a scanner, the generator.  Defendant's second and fourth arguments fail because it cites no authority for them and because this claim is not for products liability but for fraud.

We do, however, find merit in the third argument.  To begin, we will not consider Plaintiff's first contention, that Neuisys knew it had to replace generators on other NeuViz dual slice scanners due to tube arcing.  This contention is supposedly based on a statement to Wilkie from a former Neuisys employee, but we can find no support for the statement in the record, and Plaintiff does not cite to any portion of the record that would support it.  Hence we limit our analysis of Plaintiff's argument to its last three contentions.

Plaintiff's second contention is not probative of a material omission because an underpowered generator has not been tied by any evidence to any problems with the scanner.  Neither is the third contention probative, as that merely shows that Neuisys was servicing problems with its product, something that companies do every day.  The fourth contention is also not probative of a material omission.  In regard to generator replacement, the only evidence of record concerning the exact number of generators replaced is three out of twenty-six generators.  In regard to service calls, there is only the vague testimony of Asher Royal that there were service calls about generators before Yorktowne bought its scanner but that he did not know what the problems were with the generators, or whether they were repaired or replaced.  In regard to tube arcing, the evidence shows that tube arcs happen on all scanners, regardless of make.  Even Wilkie acknowledged that tube arcing was a common problem on all scanners when she said that the Neuisys scanner experienced tube arcing more frequently than any other scanner she had operated, certainly implying that tube arcing occurred on all scanners.

We will therefore enter summary judgment on this part of the fraudulent inducement claim.

The third part of Plaintiff's fraudulent inducement claim is that Neuisys intentionally failed to disclose that the KUBS software was not FDA approved at the time the scanner was delivered and that Yorktowne would be required to pay a licensing fee when the software was approved.

Defendant moves for summary judgment on this claim on two grounds. First, it appears to argue that the claim fails   because Dr. Baselli knew during negotiations that the software was pending FDA approval.  Second, assuming that Dr. Baselli did not know that the software was still pending approval, Defendant relies on Dr. Baselli's testimony at his deposition that he would have ordered the scanner even if he had known that FDA approval was pending.  As to the licensing fee, Defendant relies on Dr. Baselli's testimony that even if he had known about the one-time $10,000 fee, he would still have bought the scanner, but altered how he negotiated for it.  Based on the latter two evidentiary submissions, Defendant argues that Plaintiff cannot show reliance on the omission.

In opposition, Plaintiff relies on Dr. Baselli's testimony that Neuisys told Yorktowne the scanner could produce KUBS upon delivery and installation, regardless of whether FDA approval was pending.  As to Dr. Baselli's admission that he would have bought the scanner anyway, Plaintiff points out that Dr. Baselli's "partners," the other physician members in Yorktowne Urology, also were decision makers on whether the

scanner was purchased, and there is no evidence in the record to show that they would have purchased the scanner regardless of the omissions by Defendant.

We agree with Plaintiff that Defendant has failed to meet its burden on summary judgment to show an absence of evidence to support this part of the fraudulent inducement claim.  Dr. Baselli thought the scanner could be used immediately, regardless of whether FDA approval was pending or not.  Hence that he would have ordered the scanner even if he had known that FDA approval was still pending is irrelevant to this claim.  This aspect of the fraudulent inducement claim will therefore proceed.

B. *The Breach-of-Contract Claim*

Plaintiff's breach-of-contract claim relies on two provisions in Article 2 of the North Carolina Commercial Code, the Article dealing with sales.  Plaintiff contends it properly rejected the scanner under N.C. Stat. Ann. § 25-2-601 but if rejection was not proper, it properly revoked its acceptance under N.C. Stat. Ann. § 25-2-608(1).  Defendant argues that Yorktowne cannot rely on the Sales Article because Yorktowne leased the scanner from ACI Financial, which makes Plaintiff a finance lessee.  Thus any rights it might have must come from Article 2A of the North Carolina Commercial Code, which deals with finance leases.

In normal circumstances, we would agree with Defendant.  Plaintiff did enter into a finance lease with ACI Financial, purporting to lease the scanner from ACI.  The difficulty here is that there is no supply contract in the record.  In N.C. Stat. Ann. §

25-2A-103(1)(g), a "finance lease" is defined as one where the lessor, here ACI Financial,

has acquired a product by contract (the "supply contract," as defined in subsection

103(1)(y)) so that the product can in turn be leased to the entity that will be using it, the

finance lessee, here Yorktowne.  See also White & Summers, Uniform Commercial Code

§ 13-3, Finance Leases.  Defendant says the supply contract here is the Sales

Agreement between Neuisys and Yorktowne, but that cannot be true because a supply

contract shifts title from the manufacturer or supplier, here Neuisys, to the finance lessor,

here ACI Financial.  The Sales Agreement shifts title between Neuisys and Yorktowne,

the lessee.  Yorktowne may therefore be correct in contending that it still has rights under

Article 2 by way of the Sales Agreement.[10]  On the other hand, Plaintiff did enter into a

finance lease with ACI Financial.  In any event, we need not resolve whether Article 2 or

Article 2A applies.  Even if Plaintiff can rely on the cited provisions of Article 2, it has no

breach-of-contract claim.

As noted, Plaintiff's breach-of-contract claim asserts that it properly rejected

the scanner under N.C. Stat. Ann. § 25-2-601, but if rejection was not proper, it properly

revoked its acceptance under N.C. Stat. Ann. § 25-2-608(1).  Both of these sections

require that the goods be nonconforming before rejection or revocation can be exercised.

Under section 25-2-601, the buyer may reject "if the goods . . . fail in any way to conform

to the contract . . . ."  Under section 25-2-608(1), the buyer may revoke where the

---

[10]     In its opposition brief to summary judgment, Plaintiff asserts that the Sales
Agreement was never assigned "to any other party."  (Doc. 36, CM/ECF p. 19).

"nonconformity substantially impairs [the] value of the product to him."  "Goods" are

defined as "conforming" . . . to the contract when they are in accordance with the

obligations under the contract."  N.C. Stat. Ann. § 25-2-106(2).

Defendant moves for summary judgment on the breach-of-contract claim on

the basis that the scanner conformed to the requirements of the contract.  In support, it

makes the following arguments.  First, Plaintiff points to no provision of the sales

agreement that Defendant violated.  Second, the scanner provided usable images.

Yorktowne began scanning patients with the Scanner on or around February 9, 2009,

and could only bill for scans that produced diagnostic quality images.  Over the next ten

and one-half months, it performed 2,173 scans (services) on 925 patients, a scan rate of

four to five scans per day, five days per week.  It submitted invoices totaling $541,946.25

for these scans, and for which patients, insurers and Medicare paid Yorktowne

$387,602.74.

In opposition, Plaintiff maintains that Neuisys agreed to provide it "with a

functioning CT scanner that would meet Yorktowne's scanning needs," (doc. 36, Opp'n

Br. at CM/ECF p. 17), and that Neuisys failed in this regard.  It points to the tube arcing,

which it argues breached the contract in two ways.  First, the arcing caused the scanner

to stop functioning during the middle of a scanning sequence.  (Wilkie Aff. ¶ 23).  When

that occurred, Wilkie, the CT technologist, "had to reset the scanner and restart the

scanning sequence." (*Id.* ¶¶ 25, 40).  Second, because the scanning sequence was

restarted, the CT technologist had "to administer more radiation to patients [than] was

necessary if the scanner functioned properly."  (*Id.* ¶¶ 40 and 41).  In fact, according to

Dr. Baselli, someone at Neuisys suggested "there was something not right with the tube,"

that they "had some issues," but that Neuisys would "make it right."  Yorktowne asserts it

did not contract with Neuisys for a scanner that provided "more radiation [than] necessary

to complete the scan" or for one that "would cease operation during the middle of a

scanning sequence."  (Doc. 36, Opp'n Br. at CM/ECF pp. 19, 20).

   Plaintiff next points to image quality for the scans.  According to Plaintiff, the

images were not what Neuisys said they would be when it sold the scanner to Plaintiff,

citing some deposition testimony of Dr. Baselli.  (Doc. 33-1 Baselli Dep. at CM/ECF pp.

102-04).  Plaintiff also relies on the testimony of Dr. Singer from the Cleveland Clinic.

She testified that the Cleveland Clinic received images that they "had difficulty in

interpreting."  The Clinic "had concerns about image quality and asked for an evaluation

of the unit."  Singer contacted the Clinic's own physicists because of "ongoing concerns

about image quality . . . difficulty in interpreting the images," (*id.* at CM/ECF p. 11),

concerns about the Clinic's "ability to provide a quality interpretation based on the images

that we were receiving from that scanner."  Dr. Baselli could also see the "lack of quality"

in the scans, images that "were fuzzy, blurry and full of artifact."  Yorktowne asserts it did

not contract with Neuisys for a scanner that provided "images that difficult to read" even

though the scanner was able to produce some successful scans.  (Doc. 36, Opp'n Br. at

CM/ECF p. 21).

Finally, Plaintiff argues that the scanner had to receive ACR accreditation. However, the scanner could not be operated using the protocols that Montagnese recommended to obtain scans that would meet the standards.  Plaintiff asserts that Neuisys breached the Sales Agreement by providing a scanner that could not pass ACR accreditation.

We have to agree with Defendant that none of Yorktowne's evidence shows that Neuisys breached the contract.  That means that Defendant did not provide a product that was nonconforming since goods that conform are ones that meet the obligations of the contract.  And since the scanner conformed to the obligations of the Sales Agreement, Plaintiff has no basis to reject or revoke the Agreement as a buyer can only do so if the goods are nonconforming.

We begin, as Defendant points out, with the fact that the Sales Agreement only warranted that the scanner would "be free from defects in material or workmanship" and limited Neuisys's obligation to repair or replacement of defective parts.  (Doc. 1-5, Compl., Ex. B, Agreement ¶¶ 10.1 and 10.2).  The Agreement disclaimed any other warranty, including any express or implied  warranties of merchantability or fitness for a particular purpose.  (*Id.*, ¶ 10.4).

Therefore, Defendant met its obligation under the Agreement when the scanner produced usable scans.  As Defendant points out, while Dr. Singer said the Cleveland Clinic "had difficulty in interpreting" the scans, the Clinic "never refused to continue reading" the scans and did not ask that patients be rescanned.  Instead they

asked that Wilkie "try some different reconstruction algorithms . . . ways of taking the data that's generated by the CAT scan and reconstructing it to create an  image."  Further, the scanner produced usable scans for the ten and one-half months Plaintiff used it, 2,173 scans on 925 patients, for which Yorktowne charged $541,946.25, and for which patients, insurers and Medicare paid Yorktowne $387,602.74.  Plaintiff also has no expert testimony concerning the quality of the scans.[11]

Plaintiff says the tube arcing violated the contract.  Plaintiff's first complaint about tube arcing is that it caused the scanner to stop functioning during the middle of a scanning sequence.  We reject this position because the evidence of record shows that tube arcs happen on all scanners, regardless of make.  Even Wilkie, Plaintiff's CT technologist, acknowledged this when she affirmed that the scanner "experienced tube arcing more frequently than any other scanner" she "had operated."  We agree with Defendant that at the very least expert testimony was required to show whether the frequency of tube arcing was significant.[12]  It is also significant that Yorktowne has not shown that a scan did not take place because of the arcing and that it has no records actually showing when the scanner could not be used.

The second complaint about tube arcing is that when it occurred, Wilkie had to reset the scanner and restart the scanning sequence.  In doing so, she administered

---

[11]   *Schmidt v. Currie*, 217 F. App'x 153, 156 (3d Cir. 2007)(nonprecedential)(citing *Lentino v. Fringe Employee Plans, Inc.*, 611 F.2d 474 (3d Cir. 1979)), the Third Circuit discussed when an expert is needed.

[12]   *See Schmidt*, *supra*.

more radiation to patients than was necessary if the scanner had not arced.  We agree with Defendant that this argument fails because expert testimony is required to show that more radiation than was necessary was used on patients because of a scan restart, especially since this complaint is not that the radiation was unsafe but that it was more than necessary.[13]

Plaintiff's final complaint is that the scanner could not meet ACR accreditation because the scanner could not be operated using the protocols that Montagnese recommended to obtain accreditation.  We reject this claim because Plaintiff points to no provision of the Sales Agreement requiring that the scanner pass ACR accreditation.

Finally, we note that Yorktowne complains that Neuisys agreed to provide it "with a functioning CT scanner that would meet Yorktowne's scanning needs," but that Neuisys failed to do so.  Whatever Plaintiff means by this vague standard of meeting its "scanning needs," the Sales Agreement contains a merger clause which, in combination with North Carolina's parol evidence rule, bars any reliance on this representation.  *See Zinn v. Walker*, 361 S.E.2d 314, 318 (N.C. App. 1987).

We will grant summary judgment on the breach-of-contract claim.

C.  *The Claim For Breach of the Contractual Duty of Good Faith*

---

[13]   *See Schmidt, supra.*

"Every contract or duty within this Chapter imposes an obligation of good faith in its performance and enforcement."  N.C. Stat. Ann. § 25-1-304.  Plaintiff contends Neuisys breached its duty of good faith by concealing the problems that other sites had with the scanner regarding the generator and tube arcing and by indicating that the problems arose because the scanner had sat idle for so long.  Additionally, despite telling Dr. Baselli that Neuisys would "make it right," it never made the scanner function properly under the Sales Agreement.

Plaintiff cites no authority for this position, and we think that no such claim can be made when Plaintiff cannot point to a breach of any of its contractual rights.  *See generally Hamm v. Blue Cross and Blue Shield of North Carolina*, No. 05-5606, 2010 WL 5557501, at *10 (N.C. Super. Aug. 27, 2010)(citing cases).

We will issue an appropriate order.

 /s/William W. Caldwell
William W. Caldwell
United States District Judge

DATE: August 30, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

YORKTOWNE UROLOGY, P.C.,          :
                                  :
            Plaintiff             :
                                  :   CIVIL NO. 1:CV-10-644
      vs.                         :
                                  :
NEUISYS, LLC.                     :
                                  :
            Defendant             :

## O R D E R

AND NOW, this 30th day of August, 2011, upon consideration of

Defendant's motion (doc. 31) for summary judgment, and Defendant's motion (doc. 39) to

strike portions of the affidavit of Anita Wilkie, it is ordered that:

    1.  The motion for summary judgment is granted in part.

    2.  The Clerk of Court shall enter judgment in favor of
Defendant and against Plaintiff on Count III, breach of
contract, and on Count VII, breach of the contractual duty of
good faith and fair dealing.

    3.  The Clerk of Court shall enter judgment in favor of
Defendant and against Plaintiff on Count I, the fraudulent
inducement claim, except for that part of the claim based on
misrepresentations concerning the immediate ability of the
scanner to make KUBS scans.

    4.  Defendant's motion to strike is granted as to paragraph
41 of the Wilkie affidavit.

          /s/William W. Caldwell
William W. Caldwell
United States District Judge